LAWRENCE M. HADLEY - State Bar No. 157728
lhadley@glaserweil.com
GLASER WEIL FINK HOWARD
 JORDAN & SHAPIRO LLP
10250 Constellation Boulevard, 19th Floor
Los Angeles, California 90067
Telephone:  (310) 553-3000
Facsimile:   (310) 556-2920

Attorneys for Plaintiff
Superhuman, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| SUPERHUMAN INC.,<br><br>Plaintiff,<br><br>v.<br><br>THERMOLIFE INTERNATIONAL, LLC,<br><br>Defendant. | CASE NO.: 2:24-cv-09589-AB-AGR<br><br>Hon. Andre Birotte Jr.<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF SUPERHUMAN INC.'S APPLICATION FOR:**<br><br>**A TEMPORARY RESTRAINING ORDER**<br><br>**AN ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**<br><br>[Application for Temporary Restraining Order, Application for Order to Show Cause re Preliminary Injunction; Memorandum of Points and Authorities; Declarations of Jeff S. Volek, Tristan Stent, and Robert Leighton; and, Proposed Order filed concurrently herewith]<br><br>Hearing Date:<br>Hearing Time:<br>Courtroom:  7B |

Glaser Weil

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ...........................................................1

II.    FACTUAL BACKGROUND ............................................4

    A.    Superhuman and Its Supplement Products ...........................4

    B.    Defendant Thermolife and the '531 Patent............................4

    C.    Thermolife expressly told the U.S. PTO that "nitrate salt" and "non-ester nitrate" are satisfied only by a "supplementary amount" of nitrate and not by trace or de minimis quantities of nitrates. ...........6

    D.    Nitrates and amino acides are naturally occurring................................8

    E.    The prior art is filled with examples of supplements that contain amino acids, along with vegetables or other components that have small quantities of nitrates. ........................................9

    F.    Thermolife's Unjustified and Damaging Amazon Takedown Notices ......................................................10

III.    ARGUMENT ...............................................................12

    A.    Legal Standard ...................................................12

    B.    There is Jurisdiction Before This Court................................13

    C.    Plaintiff Has a Substantial Likelihood of Success on the Merits Because Its Products Do Not Infringe the '531 Patent and, if they could infringe, the patent is invalid....................................13

        1.    Thermolife cannot show infringement ......................13

        2.    Judicial estoppel bars Thermolife from asserting that the nitrate limitations are satisfied by the trace quantities of nitrate shown in Thermolife's testing of the Accused Products. ............................................16

        3.    If trace nitrates infringe, the claims of the '531 Patent are invalid. ...........................................17

            a.    Claims of the '531 Patent that cover trace nitrates that have no effect in the human body are invalid under Section 101. ...........................................17

            b.    Claims of the '531 Patent that would cover tiny quantities of nitrates are anticipated by the prior art......19

        4.    Plaintiff Will Suffer Irreparable Harm to its Business if this Motion Is Not Granted.............................................21

i

MEMORANDUM OF POINTS AND AUTHORITIES ISO APPLICATION FOR TEMPORARY RESTRAINING ORDER, AND FOR AN ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

#2443939v1<DOCDB1> - Superhuman final memorandum in support of motion for TRO and PI (2024-11-11 2 p.m. draft)

Glaser Weil

**5.** The Balance of Harms Favors Plaintiff, as the Harm to
Plaintiff Outweighs Any Harm to Defendant. ......................... 23

**6.** Plaintiff's Requested Relief Serves the Public Interest ........... 24

**IV.** APPROPRIATE BOND .................................................................... 24

**V.** CONCLUSION ............................................................................... 25

Glaser
Weil

MEMORANDUM OF POINTS AND AUTHORITIES ISO APPLICATION FOR TEMPORARY RESTRAINING
ORDER, AND FOR AN ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION
#2443939v1<DOCDB1> - Superhuman final memorandum in support of motion for TRO and PI (2024-11-11 2 p.m. draft)

## TABLE OF AUTHORITIES

**CASES**

*Abbott Lab'ys v. Baxter Pharm. Prod., Inc.*,
  471 F.3d 1363 (Fed. Cir. 2006) ............................................................... 22

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
  239 F.3d 1343 (Fed. Cir. 2001) ............................................................... 19

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
  314 F.3d 1313 (Fed. Cir. 2003) ............................................................... 19

*Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*,
  569 U.S. 576 (2013) .......................................................................... 19, 20

*Aylus Networks, Inc. v. Apple Inc.*,
  856 F.3d 1353 (Fed. Cir. 2017) ............................................................... 16

*Bee Warehouse, LLC v. Blazer*,
  671 F. Supp. 3d 1347 (N.D. Ala. 2023) ..................................................... 23

*Beyond Blond Prods., LLC v. Heldman*,
  479 F. Supp. 3d 874 (C.D. Cal. 2020) ...................................................... 26

*Beyond Blond Productions, LLC v. Heldman*,
  2021 WL 9315215 (C.D.Cal., 2021) ........................................................ 26

*Billups-Rothenberg, Inc. v. Associated Reg'l & Univ. Pathologists, Inc.*,
  642 F.3d 1031 (Fed. Cir. 2011) ............................................................... 21

*BPI Sports, LLC v. ThermoLife Int'l, LLC*,
  2021 WL 2946170 (S.D. Fla. July 14, 2021) ................................................ 7

*Chimie v. PPG Indus., Inc.*,
  402 F.3d 1371 (Fed. Cir. 2005) ............................................................... 16

*ChromaDex, Inc. v. Elysium Health, Inc.*,
  59 F.4th 1280 (Fed. Cir. 2023) ........................................................... 20, 21

*Data Gen. Corp. v. Johnson*,
  78 F.3d 1556 (Fed. Cir. 1996) ............................................................... 18

*Gillespie v. Dywidag Sys. Int'l, USA*,
  501 F.3d 1285 (Fed. Cir. 2007) ............................................................... 16

*Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*,
  523 F.3d 1304 (Fed. Cir. 2008) ............................................................... 16

*In re ThermoLife Int'l LLC*,
  796 F. App'x 726 (Fed. Cir. 2020) ............................................................ 7

*Laub v. Horbaczewski*,

Glaser
Weil

2024 WL 3221797 (C.D. Cal. May 13, 2024) ................................................... 14, 23

*Lawrence Distrib. Co., Inc. v. Parimar, Inc.*,
  2024 WL 1358356 (C.D. Cal. Mar. 28, 2024) .......................................... 14

*London v. Carson Pirie Scott & Co.*,
  946 F.2d 1534 (Fed. Cir. 1991) ............................................................... 15

*Mechanix Wear LLC v. Branson*,
  2024 WL 2846068 (C.D. Cal. Apr. 23, 2024) ........................................... 14

*Medcursor Inc. v. Shenzen KLM Internet Trading Co.*,
  543 F. Supp. 3d 866 (C.D. Cal. 2021) .................................... 3, 15, 25, 26

*Monsanto Co. v. Scruggs*,
  459 F.3d 1328 (Fed. Cir. 2006) ............................................................... 15

*Nat. Alternatives Int'l, Inc. v. Creative Compounds, LLC*,
  918 F.3d 1338 (Fed. Cir. 2019) ............................................................... 20

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  572 U.S. 898 (2014) ................................................................................ 18

*Omega Eng'g, Inc, v. Raytek Corp.*,
  334 F.3d 1314 (Fed. Cir. 2003) ............................................................... 16

*Quintana v. Lermond*,
  2024 WL 3416251 (C.D. Cal. July 15, 2024) ........................................... 14

*Seachange Intern., Inc. v. C-COR, Inc.*,
  413 F.3d 1361, 75 U.S.P.Q.2d 1385 (Fed. Cir. 2005) ............................. 16

*Sherwin-Williams Co. v. PPG Indus., Inc.*,
  2024 WL 3534113 (Fed. Cir. July 25, 2024) ........................................... 18

*Shuffle Master, Inc. v. VendingData Corp.*,
  163 F. App'x 864 (Fed. Cir. 2005) .......................................................... 17

*Standard Havens Prod., Inc. v. Gencor Indus., Inc.*,
  953 F.2d 1360 (Fed. Cir. 1991) ............................................................... 22

*ThermoLife Int'l, LLC v. GNC Corp.*,
  922 F.3d 1347 (Fed. Cir. 2019) ................................................................. 6

*Thermolife Int'l, LLC v. Human Power of N Co.*,
  2021 WL 6303232 (W.D. Tex. Dec. 21, 2021) ........................................... 7

*Thursday LLC v. Klhip Inc.*,

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Glaser
Weil

iv

2017 WL 6947456 (M.D. Fla. Dec. 11, 2017) ..................................................... 23, 24

**Statutes**

28 U.S.C. §§ 1331, 1338, 1391, 2201, 2202, and/or 1400 ......................................... 15
35 U.S.C. § 101.............................................................................................. 17, 18, 19
35 U.S.C. § 102.................................................................................................... 21

Glaser Weil

v

This lawsuit was previously filed in the Southern District of Florida and, in that case, Superhuman also sought a temporary restraining order and preliminary injunction.  Thermolife moved to dismiss the Florida action based on a lack of personal jurisdiction.  Rather than engage in a wasteful fight over jurisdiction, Superhuman dismissed the Florida action and filed here, where Thermolife resides.  Superhuman seeks the same injunctive relief in this Court.  However, the complaint also incorporates new facts learned from Thermolife during the Florida action, namely, that Thermolife was in possession of laboratory test results that demonstrate conclusively that Superhuman's products do not infringe.

# I.   **INTRODUCTION**

Defendant Thermolife has an established track record of using its patents to baselessly attack smaller companies that sell their products on Amazon when Thermolife knows full well that it cannot support a claim of infringement.  Thermolife has learned to exploit the Amazon takedown process, through which reckless and erroneous allegations of infringement can lead to extrajudicial injunctions that prevent businesses from accessing what courts have identified as a "make-or-break sales platform in the current e-commerce environment." *See Medcursor Inc. v. Shenzen KLM Internet Trading Co.*, 543 F. Supp. 3d 866, 878 (C.D. Cal. 2021).  This case represents a prime example of the way that Thermolife abuses its patents rights to inflict massive harm on innocent companies that can only be remedied by preliminary injunctive relief.

Superhuman sells a variety of workout supplements on Amazon, including the two products at issue here, both of which are specifically formulated and marketed as non-nitrate products.  Notwithstanding that fact, Thermolife submitted an infringement takedown request against Superhuman's non-nitrate products based on a patent with claims that only cover supplements *with nitrates*.  Indeed, there was no mystery about the level of nitrates in Superhuman's products, because Thermolife had them tested.  But the testing Thermolife itself conducted established conclusively that

1

Superhuman's products do not contain a level of nitrates that could result in infringement. Specifically, test results that Superhuman finally obtained from Thermolife[1] revealed that the Accused Products contain nitrate levels of only about ***20 parts per million***, which amounts to only 0.167 to 0.181 mg of nitrates in each 8.2g serving of the product.

Thermolife itself told the U.S. PTO that such a small quantity is "de minimis" and not covered by its claims. It made this concession because it knew that without the exception, its patent would have been found invalid. If such a tiny amount of nitrates could result in infringement, the asserted claim (claim 62) would be invalid in view of prior art that meets those limitations, and would cover unpatentable subject matter under Section 101. In fact, the asserted claim would be invalid in view of any prior art supplement containing amino acids and any leafy vegetable because all leafy vegetables contain small quantities of nitrates, as is well known in the supplement space. Thermolife is well aware of all of this; its actions to pursue Superhuman nonetheless are objectively unreasonable, and this case is exceptional.

Even though Thermolife's infringement allegation was baseless and directly contradicted by its own admissions to the U.S. PTO, Amazon blindly accepted Thermolife's infringement assertion and summarily removed the listings for Superhuman's products. By exploiting the Amazon takedown process, Thermolife has helped itself to an unjustified ***extrajudicial*** injunction against Superhuman. Ordinarily, when a patent owner wishes to stop another company from selling a product that it claims infringes its patents, it must file a lawsuit and obtain a preliminary injunction, which would require a patent owner to demonstrate a likelihood of infringement before a court will alter the status quo.

---

[1] When Superhuman originally filed this case in district court in Florida, Thermolife had refused to provide evidence of any test results unless Superhuman agreed to enter into a predatory license agreement. It was only after filing suit that Thermolife produced its testing – likely concealing those test results because they clearly establish that there can be no infringement.

1    But as Thermolife knows, Amazon does not behave like a court of law, and in

2 particular, does not consider patent validity or file histories when assessing patent

3 complaints raised before it.  Thermolife was therefore able to hide from Amazon its

4 admissions to the U.S. PTO affirming that tiny amounts of nitrates cannot result in

5 infringement (or result in invalidity).  Thermolife's request to Amazon to delist

6 Superhuman's product on patent infringement grounds was a gross exploitation of the

7 Amazon process and exceptional, when at the same time it also knew that: (a) after

8 conducting testing, the products indisputably contain only trace amounts of nitrates (a

9 small fraction of even one milligram per serving) and (b) Thermolife had previously

10 conceded to the U.S. PTO that such tiny amounts of nitrate content would *not* infringe

11 the patent. These facts are simply irreconcilable with Thermolife's completely

12 contrary statements made to Amazon in arguing that Superhuman's product infringed

13 its patent, and the wrongful result achieved with Amazon should not be allowed to

14 stand.

15    In this Motion, Superhuman requests nothing more than for this Court to return

16 the parties to the status quo—the conditions that existed prior to Thermolife's

17 wrongful conduct—pending actual judicial assessment of Thermolife's baseless

18 patent infringement claim.  As is true in all cases of this nature, Superhuman should

19 be permitted to sell its products unless and until Thermolife actually demonstrates an

20 entitlement to an injunction under the appropriate legal standards, rather than

21 obtaining the very same extra-judicial injunction through *ex parte* engagement with

22 Superhuman's key distribution partner (Amazon).

23    To date, Thermolife has made no such showing, nor can it do so.  There is no

24 possible way that the '531 Patent is ***both*** valid and infringed.  Thermolife's argument

25 to the U.S. PTO that such small amounts of nitrates, by definition, do not infringe its

26 patent entirely sinks any patent infringement claim against Superhuman.  As a result,

27 Superhuman is overwhelmingly likely to succeed on its claims for declaratory

28 judgment of non-infringement and invalidity.  And meanwhile, the consequences for

3

Superhuman have been catastrophic and are irreparable.  Superhuman's sales through its most important distributor have been reduced to zero, it is hemorrhaging customers at an alarming rate that it may never be able to regain, and it is suffering business-level impacts that are financially unsustainable for the Company.

## II.    FACTUAL BACKGROUND

### A.    Superhuman and Its Supplement Products

Superhuman is a sports nutrition company that develops, markets, and sells a range of popular dietary supplements, including its "Superhuman Pre" and "Superhuman Extreme Pre" workout formulas (the "Accused Products").  Exs. 1 and 2.[2]  The Superhuman Supplements provide consumers with a number of benefits, including amplified nitric oxide in the body.  However, unlike other supplements promoting circulating nitric oxide in the body, the Accused Products do not include nitrates as an ingredient.  The ingredients for the Accused Products are shown on the Supplement Facts panel for each, attached hereto as Exs. 1 and 2.  Superhuman sells the Accused Products and other products through a variety of channels, but Superhuman's most important retail channel is Amazon.com.

### B.    Defendant Thermolife and the '531 Patent

Defendant Thermolife does not sell products to consumers, but sells a nitrate-based nitric oxide-boosting ingredient called NO3-T (arginine nitrate).  Thermolife holds a patent portfolio purporting to cover certain nitrate-containing products that boost nitric oxide and makes money by attempting to force companies wishing to market supplement products to either purchase their ingredient, NO3-T, or obtain a license from, and pay royalties to, Thermolife.

Thermolife has an established reputation as a vexatious litigant and an

---

[2] References to "Ex." herein refer to exhibits to the Declaration of Robert Leighton submitted in support of this motion.

established track record of attempting to exploit the Amazon takedown process.[3] *ThermoLife Int'l, LLC v. GNC Corp.*, 922 F.3d 1347, 1355 (Fed. Cir. 2019) (ThermoLife and counsel brought "frivolous claims," and their "motivation was seemingly to extract nuisance-value settlements"); *BPI Sports, LLC v. ThermoLife Int'l, LLC*, No., 2021 WL 2946170, at *2 (S.D. Fla. July 14, 2021) (sanctioning Thermolife where its owner, Ron Kramer, "committed a fraud upon the Court when [he] knowingly fabricated evidence to advance his case and repeatedly attempted to obstruct discovery of that fraud"); *Thermolife Int'l, LLC v. Human Power of N Co.*, 2021 WL 6303232, at *1 (W.D. Tex. Dec. 21, 2021) (granting injunctive relief and ordering that "ThermoLife shall refrain from taking any action to further pursue evaluation through Amazon's Patent Evaluation Process any of the patents at issue already pending in this case").

Here, Thermolife has claimed that the Accused Products infringe one of the patents owned by Thermolife, U.S. Patent Number 8,455,531. *See* Ex. 5 (the "'531 Patent"). The '531 Patent is a continuation-in-part application that stems from U.S. Patent number 7,777,074—which was held ***invalid*** by the Federal Circuit in 2020. *In re ThermoLife Int'l LLC*, 796 F. App'x 726, 735 (Fed. Cir. 2020) (holding that Thermolife's claim directed to creatine nitrate was invalid as anticipated by the prior art). The '531 Patent has been through two *ex parte* reexaminations at the U.S. PTO, during each of which, the claims of the '531 Patent were significantly amended in an attempt to avoid them being found invalid. The reexamination certificates showing the claims of the current '531 Patent are included in Ex. 5.

Every current claim of the '531 Patent requires ***some form of nitrates***. Specifically, all claims require either a "non-ester nitrate compound" or a "nitrate salt compound."

---

[3] According to Docket Navigator, Thermolife has been involved in 161 patent cases and has a "win rate" of 0.0%, meaning that it has "lost" or settled every case it has brought. Ex. 13.

5

For example, Claim 62 of the '531 Patent states:

62. A solid supplement formulation comprising:

    at least one non-ester nitrate compound; and

    at least one isolated amino acid compound selected from the group consisting of Agmatine, Beta Alanine, Citrulline, L-Histidine, Norvaline, Ornithine, Aspartic Acid, Cysteine, Glycine, Lysine, Methionine, Praline, Tyrosine, and Phenylalanine,

    wherein the at least one isolated amino acid compound is a separate compound than the at least one non-ester nitrate compound.

*See also* Claim 1 (requiring a "nitrate salt compound"). Most claims of the '531 Patent require a specific minimum quantity of nitrates (e.g., 30.7 mg) or a "pharmaceutically effective amount." However, certain claims (like claim 62 above) do not recite a nitrate quantity limitation.

**C.**    <u>**Thermolife expressly told the U.S. PTO that "nitrate salt" and "non-ester nitrate" are satisfied only by a "supplementary amount" of nitrate and not by trace or de minimis quantities of nitrates.**</u>

In 2019, ThermoLife filed a request for *Ex Parte r*eexamination of the '531 Patent at the U.S. PTO. Ex.14. The reason Thermolife did so was to attempt to avoid two items of prior art that had been raised during a prior litigation: Harris, International Publication WO 2005/115175 ("Harris") and Yoshimura, U.S. Patent No. 5,576,351 ("Yoshimura"). *Id.*

Harris discloses snack bars containing an amino acid (creatine) and thiamine mononitrate. Ex. 14 at Exhibit B. Even though Harris discloses a product with an amino acid and a nitrate, Thermolife took the position that the quantity of nitrates in Harris was too small to satisfy the '531 Patent claims. Specifically, Thermolife argued that Harris does not "provide a supplementary amount of at least one nitrate salt compound and at least one isolated Creatine compound as required in claims 1, 7, 62, and 68." Ex. 14 at 7-8. Thermolife stated that Harris discloses only 0.02 mg nitrate and this amount was simply too small to satisfy the "nitrate salt" or "non-ester

nitrate" limitations:

> As indicated in Example 3 of Harris, ***the amount of nitrate provided in the snack bar containing creatine is far too low to reasonably interpret the disclosed snack bar as a supplement composition comprising a nitrate salt or non-ester nitrate***. The … corresponding weight of nitrate provided as a result of providing thiamin as thiamin mononitrate is about 0.02 mg nitrate, which is well below the limits established by the FDA for foodstuff. The amount of nitrate ingested from eating of the snack bars described in Harris is so small that it is actually less than the amount of nitrate that could be ingested from drinking a cup of water, as the National Primary Drinking Water Regulations allows up to 10 mg nitrate to be found in one liter of drinking water. Thus, in view of the federal regulations in 2005 regarding the RDA, and the established teachings in the prior art concerning a supplement formulation comprising a nitrate salt and an amino acid compound, ***the de minimis amount of nitrate disclosed in Harris cannot be reasonably interpreted to teach a supplement formulation comprising a nitrate salt or non-ester nitrate***.

Ex. 14 at 9 (emphasis added).  Thermolife explained that if the Harris product included the amount of thiamine mononitrate permitted by FDA regulations, it would provide 0.22 mg of nitrate, which Thermolife contended was still "de minimis":

> The amount of nitrate ingested from ingesting thiamine mononitrate in an amount that provides the maximum RDA of thiamine is about ***0.22 mg***. ***This amount is still <u>far too low</u> to result in nitrate supplementation***. As noted above, even the amount of nitrate provided in the maximum RDA dose of thiamine mononitrate (which is 10 times more than the dose of nitrate disclosed in Harris) is still less than the amount of nitrate ingested from drinking water. Thus, ***even the broadest reasonable interpretation of the compositions described in Harris still only allow a de minimis amount of a nitrate and does not encompass compositions for supplementation of nitrates.***

Ex. 14 at 10.  (emphasis added).  Thermolife concluded that "Because Harris does not describe a composition that provides a ***supplementary amount*** of nitrate, the reference does not anticipate claims 1, 7, 62, and 68. " *Id.*

Similarly, Thermolife argued that Yoshimura did not contain a nitrate salt because Yoshimura did not provide a "supplementary amount" of nitrate, again comparing the amount to the 10 mg permitted in drinking water:

7

> ***The amount of nitrate in the compositions described in Yoshimura also is not a supplementary amount***. . . . the amount of nitrate provided from the amount of thiamine mononitrate described by Yoshimura is as much as 100 times less than the amount of nitrate that would be ingested from drinking one liter of drinking water.

Ex. 14 at 30 (emphasis added). Thus, according to Thermolife, the terms "nitrate salt" and "non-ester nitrate compound" do not encompass de minimis amounts of nitrates.

Thermolife asserted that a "supplementary amount" of nitrate would be at least "greater than the amount of nitrate ingested from drinking water," while also asserting that EPA regulations allow "up to 10 mg nitrate" in a liter of drinking water  Ex. 14 at 12 (with respect to Harris) at 37 (with respect to Yoshimura).  And Thermolife's expert declaration (relied upon by Thermolife in the reexamination) asserted that nitrate supplementation requires amounts "over" 20-30 mg:

> any effect of nitrate administration, pharmacological or otherwise, such as vasodilation and increase in athletic performance, would require amounts of nitrate that are ***over*** what one would ingest from a typical meal, which would be around ***20-30 mg*** of nitrate per meal.

Ex. 15 at ¶ 6.  Thermolife's expert made clear that "ingesting a dose of 0.1 mg nitrate, such as through ingestion of Yoshimura's compositions, ***would do absolutely nothing***." *Id.* at ¶ 8. Thermolife's expert instead stated that "we must administer to our human subjects 0.1 mmol nitrate/kg body weight, which is about 6.2 mg/kg body weight, to produce consistent results demonstrating administration of nitrates actually could produce any physiological effect." *Id.* at ¶ 6.

**D.    Nitrates and amino acides are naturally occurring.**

Nitrate is ubiquitous in nature, found in water, soil, fruits, vegetables (and other plants), meats, fish and dairy products.  Volek Decl. at ¶ 50-52. It is well known that vegetables and other natural products contain nitrates.  *Id.* at ¶ 53. There have been numerous studies quantifying nitrates in vegetables.  Green leafy vegetables like lettuce, spinach, and kale are known to be particularly high in nitrates.  *Id.* at ¶ 55-57.

8

Amino acids are also routinely found in nature, so much so that they are referred to as the "building blocks of life." *Id.* at ¶ 66. Both animal and plant proteins are made up of about 20 common amino acids. *Id.* at ¶ 67. The body uses amino acids to grow, digest food, repair tissue, perform bodily operations and provide energy. *Id.* Amino acids and nitrates are also both made by the human body. *Id.* at ¶ 68.

**E.    <u>The prior art is filled with examples of supplements that contain amino acids, along with vegetables or other components that have small quantities of nitrates.</u>**

Thermolife did not invent combining amino acids with vegetables (as in the Accused Products). And if the claims of the '531 Patent have no quantity restriction on nitrates whatsoever, it means that the claims are anticipated by any prior art reference combining the stated amino acids with vegetables or any other ingredient that contains trace nitrates. Indeed, there are numerous examples of prior art supplements combining amino acids with plants, vegetables, thiamine, and other components that contain small quantities of nitrates.

For example, U.S. Patent No. 7,025,996 ("Miladinov") discloses a dietary supplement including amino acids lysine, phenylalanine, histidine, glutamine, along with thiamine mononitrate. Volek Decl. at ¶ 81-83. Thermolife and its experts have admitted that thiamine mononitrate contains nitrates. Ex. 14 at 10. Similarly, U.S. Patent Appl. Publication 2004/1817 ("Giampapa") discloses nutritional supplements including ornithine, tyrosine, cysteine, along kale, rosemary, and spirulina—all of which contain nitrates. Volek Decl. at ¶ 84-88. U.S. Patent Appl. Publication No. 2007/26109 ("Foulger") discloses nutritional supplements, including a supplement comprising: lysine, histidine, phenylalanine, alone with thiamine and spirulina. *Id.* at ¶93. There are other examples. *See, e.g.,* Volek at ¶¶ 88-94.

It cannot be seriously disputed that supplements that contain amino acids, along with small amounts of nitrates are pervasive in the prior art.

**F.     Thermolife's Unjustified and Damaging Amazon Takedown Notices**

On September 10, 2024, Superhuman received notices that Thermolife had filed claims with Amazon, alleging that Superhuman's Pre and Extreme Pre products infringe the '531 Patent (the "Takedown Notices").  Exs. 6 and 7.  The Takedown Notices did not specifically identify which claim or claims of the '531 Patent were allegedly infringed.  *Id.*

On September 17, 2024, Superhuman sent a letter to Thermolife demanding the immediate withdrawal of the Takedown Notices. Ex. 9.  This letter stated "[i]f ThermoLife has evidence to support an alleged breach of its patent through SuperHuman's product, please immediately provide evidence supporting the same." *Id.*  On September 19, 2024, Ron Kramer of Thermolife had a call with the CEO of Superhuman.  During the call, Thermolife demanded that Superhuman pay a "royalty" via a license agreement to resolve the matter.  Superhuman again requested that Thermolife provide evidence for its claim that the Accused Products meet the limitations of the '531 Patent, but Thermolife stated that it would only provide such evidence after Superhuman acceded to Thermolife's demands.

On September 18, 2024, Plaintiff submitted a response to Amazon explaining that there was no infringement.  Amazon responded only with a message that stated: "We completed our evaluation of your submission.  We do not have enough information to remove the violation at this time."[4] Ex. 12.

During this litigation, Thermolife has produced the actual Takedown Notices submitted to Amazon.  In those Takedown Notices, Thermolife referred to a prior takedown effort Thermolife had asserted against an entirely different seller for an entirely different product and then told Amazon the "situation" with Superhuman's products was "the same."  In fact, Thermolife told Amazon the Accused Products

---

[4] For one specific listing of the Accused Products, Amazon reinstated the listing on September 19, 2024.  However, on September 26, 2024 that listing was again deactivated by Amazon in response to a Takedown Notice from Thermolife.  Ex. 8.

"plainly infringe[] on claim 62 of Patent 8,455,531 *exactly* as the seller in APEX ID 11879471251":

> **Additional information**
>
> Reexamined claim 62 of Patent 8,455,531 covers a supplement composition, comprised of two types of compounds: a non-ester "nitrate", and an isolated amino acid such as "Citrulline", where these two ingredients are separate (i.e., not citrulline-nitrate). During APEX ID 11879471251, the Amazon Evaluator determined that the accused seller in that APEX likely infringed claim 62 where the accused products contained a source of "nitrate" (beet root in that case), and listed "Citrulline" on its Supplement Facts panel.
>
> The same situation applies here because Alpha Lion's Hulk Juice lists "Citrulline" on its Supplement Facts panel and contains nitrates according to gold-standard independent laboratory testing. Alpha Lion's Hulk Juice lists "Citrulline" first on its Supplement Facts panel. Additionally, Alpha Lion's Hulk Juice contains 1810mcg/serving of nitrates. You can find the Amazon receipt and test results here: https://www.dropbox.com/scl/fo/rk9y94klnkw2s34oneluh/AHwiNfQF7jUOi6t9E4MkQmU?rlkey=2m1ch4ee4z60ikphqf4byk10f&st=9pkjtqn2&dl=0. The Citrulline in Hulk Juice is separate from the nitrate because it is listed as "L-Citrulline", not "Citrulline-Nitrate" (which would be citrulline with a nitrate molecule). FDA regulations require that Supplement Facts panels be accurate.
>
> Thus, Alpha Lion's Hulk Juice plainly infringes on claim 62 of Patent 8,455,531 exactly as the seller in APEX ID 11879471251.

Ex. 19. Thermolife submitted a nearly identical Takedown Notice for the Superhuman Pre-extreme product. Ex. 20. Thermolife's statements to Amazon were misleading and wrong—the Accused Products are certainly not "exactly" "the same" as some unrelated product containing beet root.

Thermolife's Takedown Notices also purport to have provided Amazon with nitrate testing results that show that the Accused Products contain "20.3 ppm of nitrates" and "1810 mcg/serving of nitrates." Exs. 19-20. It is currently unclear if Amazon actually downloaded or reviewed such test results. But Thermolife has now produced its test reports. As prominently shown on the Supplement Facts panel for the Accused Products, the serving size is 8.2g (1/2 scoop of product) or 16.4g (1 scoop of product). Exs. 1-2. However, Thermolife's test showing 1810 mcg (equivalent of 1.81 mg) was based on a serving size of *82g*. This is five to ten times the actual serving size for the Accused Products. Thermolife's test result of 1810

mcg (1.81 mg) in 82g amounts to only **0.181 mg** in a 8.2g serving size. Similarly, Thermolife's test result of 20 ppm (which is the same as 20 mg/kg) amounts to **0.167 mg** in a 8.2g serving size.

Less than 0.2 mg per serving is well within the range of nitrates Thermolife already told the U.S. PTO was de minimis and therefore does not satisfy the "nitrate salt compound" or "non-ester nitrate compound" limitation. Accordingly, Thermolife has known all along that its own test results do not show infringement, but Thermolife asserted infringement to Amazon anyway. Following the Takedown Notices, Superhuman had each of the Accused Products tested for nitrates. The results of these laboratory tests show that the Accused Products do not contain nitrates, up to the limit of detection. Exs 10-11. These results are consistent with the miniscule amounts of nitrates allegedly found by Thermolife's own tests.

## III.   **ARGUMENT**

### A.    **Legal Standard**

"The standard for issuing a temporary restraining order ('TRO') is the same as that for issuing a preliminary injunction." *Lawrence Distrib. Co., Inc. v. Parimar, Inc.*, 2024 WL 1358356, at *3 (C.D. Cal. Mar. 28, 2024). To obtain a preliminary injunction, a plaintiff "must demonstrate: (1) a likelihood of success on the merits; (2) a likelihood that he will suffer irreparable harm without an injunction; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest." *Quintana v. Lermond*, 2024 WL 3416251, at *2 (C.D. Cal. July 15, 2024). "The Ninth Circuit applies a 'sliding scale' approach to the review of a request for a temporary restraining order or one for a preliminary injunction." *Laub v. Horbaczewski*, 2024 WL 3221797, at *5 (C.D. Cal. May 13, 2024). Accordingly, "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Id.*

The purpose of a preliminary injunction is "to preserve the status quo pending a judgment on the merits." *Mechanix Wear LLC v. Branson*, 2024 WL 2846068, at *2

12

(C.D. Cal. Apr. 23, 2024).  Preserving the status quo in the context of a patentee that has submitted an Amazon takedown notice means allowing the plaintiff to continue selling on Amazon during the pendency of the litigation.  *Medcursor Inc.*, 543 F. Supp. 3d at 880 ("Preserving the status quo would be allowing Plaintiff to continue [sell on Amazon] doing so during the pendency of this action.").

### B.    There is Jurisdiction Before This Court.

As an initial matter, this Court has subject matter jurisdiction over Plaintiff's claims in this action pursuant to 28 U.S.C. §§ 1331, 1338, 1391, 2201, 2202, and/or 1400**.**  This Court has personal jurisdiction over Thermolife because Thermolife resides in and has its principal place of business in this district.

### C.    Plaintiff Has a Substantial Likelihood of Success on the Merits Because Its Products Do Not Infringe the '531 Patent and, if they could infringe, the patent is invalid.

Thermolife has alleged that the Accused Products infringe claim 62 of the '531 Patent.  To the extent Thermolife could show infringement of this claim (or any other claim that contains no limitation on quantity of nitrates), such claims are invalid.

### 1.    Thermolife cannot show infringement

Infringement of a patent requires that "a properly construed claim reads on the accused product." *Monsanto Co. v. Scruggs*, 459 F.3d 1328, 1334 (Fed. Cir. 2006).  "There can be no infringement as a matter of law if a claim limitation is totally missing from the accused device." *London v. Carson Pirie Scott & Co.*, 946 F.2d 1534, 1538 (Fed. Cir. 1991).

As discussed above, each claim of the '531 Patent requires a "nitrate salt compound" or a "non-ester nitrate compound."  Thermolife expressly represented to the U.S. PTO that these limitations are **not** satisfied by "trace" or "de minimis" quantities of nitrates.  These limitations, according to Thermolife, require a "supplementary amount of nitrate," which Thermolife admits must be "far" in excess of 0.22 mg.  Ex. 14 at 10.  Thermolife cannot now assert a claim construction that

13

would cause these limitations to be satisfied by the trace quantities of nitrates (far less than 1 mg per serving) shown in Thermolife' testing of the Accused Products.

The doctrine of prosecution disclaimer precludes any claim construction of "nitrate salt compound" or a "non-ester nitrate compound" that encompasses trace or de minimis quantities of nitrates.[5]  Under the doctrine of prosecution disclaimer, a "patentee is held to what he declares during the prosecution of his patent." *Gillespie v. Dywidag Sys. Int'l, USA*, 501 F.3d 1285, 1291 (Fed. Cir. 2007).  This applies to statements made during reexamination.  *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1360 (Fed. Cir. 2017) ("We have also applied the doctrine based on statements made in reexamination proceedings.").  The Federal Circuit has "adopted that doctrine as a fundamental precept in [its] claim construction jurisprudence." *Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003).  "Accordingly, where the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender.  *Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) (internal quotation omitted). "Such a use of the prosecution history ***ensures that claims are not construed one way in order to obtain their allowance and in a different way against accused infringers***." *Id*. (emphasis added). Notably, disclaimer applies regardless of whether the U.S. PTO actually relied upon the patent owner's statements.  *Seachange Intern., Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1374, 75 U.S.P.Q.2d 1385 (Fed. Cir. 2005) ("An applicant's argument made during prosecution may lead to a disavowal of claim scope even if the Examiner did not rely on the argument.").

---

[5] Similarly, the doctrine of prosecution history estoppel bars any claim that the Accused Products satisfy these limitations under the doctrine of equivalents. *Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*, 523 F.3d 1304, 1312 (Fed. Cir. 2008) ("The doctrine of prosecution history estoppel prevents a patent owner from recapturing with the doctrine of equivalents subject matter surrendered to acquire the patent.")

Thermolife unequivocally represented to the U.S. PTO that de minimis amounts of nitrates do not satisfy the "nitrate salt" or "non-ester nitrate" limitations of the '531 Patent. Thermolife argued that 0.22 mg nitrate was de minimis and the nitrate limitations require an amount "far" in excess of 0.22 mg. *See supra,* Section II.C.  In fact, Thermolife repeatedly stated that these limitations require a "supplementary amount" of nitrate, which must be, at least "greater than the amount of nitrate ingested from drinking water," recognizing that EPA regulations allow "up to 10 mg nitrate" in a liter of drinking water  Ex. 14 at 12. Accordingly, the terms "nitrate salt compound" and "non-ester nitrate compound" cannot be construed as encompassing nitrates in quantities that are in the same range as Thermolife said were de minimis in the reexamination.[6]  Thus, Thermolife's own testing results showing 0.181 mg and 0.167 mg per 8.2g serving size of Accused Product cannot show infringement.  Even if these amounts are doubled for a 16.4 serving size, the quantity is still **under 0.4 mg**—certainly not "far" in excess of the 0.22 mg that Thermolife declared was de minimis.  And this amount is well under the 10 mg of nitrate Thermolife recognizes could be ingested by drinking water.  The tests do not show that the Accused Products contain the "supplementary amount" that Thermolife admits is required.

During reexamination, Thermolife's asserted that not any and all nitrate can satisfy the claims.  To the extent claims of the '531 Patent are not subject to a construction that informs the quantity of nitrates required, they are invalid as indefinite. "[A] patent must be precise enough to afford clear notice of what is

---

[6] The Court can determine this aspect of claim construction without engaging in a full claim construction analysis. *Shuffle Master, Inc. v. VendingData Corp.*, 163 F. App'x 864, 867–68 (Fed. Cir. 2005) ("[A] district court does not have to conduct a comprehensive and final claim construction in a preliminary injunction proceeding. Similarly, it is not necessary for a court to conduct an explicit claim construction if the claim construction issue is a simple one that needs no analysis, or in which there is no reasonable ground for dispute as to claim meaning.").  Superhuman reserve the right to make additional or different claim constructions arguments as this litigation progresses and/or in response to Thermolife's proposed interpretation of the claims.

15

claimed, thereby apprising the public of what is still open to them, in a manner that *avoids a zone of uncertainty* which enterprise and experimentation may enter only at the risk of infringement claims." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 899 (2014) (internal quotation omitted). To the extent the nitrate limitations of the claims are not subject to constructions that reveal what nitrates might actually satisfy the claims, Superhuman and the public would have no way to determine what supplements fall within the claims of the '531 Patent. This would lead to the precise "zone of uncertainty" problem that the Supreme Court warned against.

> ## 2. Judicial estoppel bars Thermolife from asserting that the nitrate limitations are satisfied by the trace quantities of nitrate shown in Thermolife's testing of the Accused Products.

The doctrine of judicial estoppel bars Thermolife from asserting infringement based on the same de minimis quantity of nitrates it told the U.S. PTO could not satisfy its claims. "The doctrine of judicial estoppel is that where a party successfully urges a particular position in a legal proceeding, it is estopped from taking a contrary position in a subsequent proceeding where its interests have changed." *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1565 (Fed. Cir. 1996). Judicial estoppel can result from statements made by litigant in a reexamination proceeding. *Sherwin-Williams Co. v. PPG Indus., Inc.*, 2024 WL 3534113, at *10 (Fed. Cir. July 25, 2024) (affirming judicial estoppel based on statements made in reexamination).

Although the decision whether to invoke judicial estoppel is within the Court's discretion, the Federal Circuit has delineated three nonexclusive factors to guide the judicial estoppel inquiry: "(1) whether the party's later position is clearly inconsistent with its earlier position; (2) whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled; and (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the

16

1    opposing party if not estopped." *Id.* at *7.

2        Here, Thermolife's position that de minimis quantities of nitrates (such as less

3    than 0.4 mg nitrate per serving) can satisfy the claim limitations is clearly inconsistent

4    with its statements to the U.S. PTO.  Thermolife succeeded in convincing the U.S.

5    PTO of its position on de minimis nitrates, as evidenced by the fact that claim 62

6    emerged from the reexamination with no quantity limitation.  Permitting Thermolife

7    to take a narrow stance on what satisfies the "nitrate salt" or "non-ester nitrate"

8    limitation at the U.S. PTO, but a broad stance with respect to that same issue in

9    litigation, would clearly be unfair to Superhuman and the public.  Allowing

10    Thermolife to flip its position would show that the U.S. PTO was misled.

11        ### 3.    If trace nitrates infringe, the claims of the '531 Patent are

12             invalid.

13        It is black letter law that patent claims must be construed the same (i.e., have

14    the same scope) for infringement and for invalidity.  *Amgen Inc. v. Hoechst Marion*

15    *Roussel, Inc.*, 314 F.3d 1313, 1330 (Fed. Cir. 2003) ("It is axiomatic that claims are

16    construed the same way for both invalidity and infringement.").  "A patent may not,

17    like a 'nose of wax,' be twisted one way to avoid anticipation and another to find

18    infringement." *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351

19    (Fed. Cir. 2001) (internal quotation omitted).

20        If the claims of the '531 Patent cover compositions merely containing amino

21    acids and a quantity of nitrates that Thermolife admits would have no effect in the

22    human body, these claims are invalid under Section 101 as directed to patent

23    ineligible subject matter.  In addition, if the claims cover trace quantities of nitrates,

24    then any prior art supplement disclosing amino acids and trace quantities of nitrates

25    anticipates the claims of '531 Patent, including asserted claim 62.

26        a.    **Claims of the '531 Patent that cover trace nitrates that**

27             **have no effect in the human body are invalid under**

28

17

1

## **Section 101.**

2      "Laws of nature, natural phenomena, and abstract ideas are not patentable."

3  *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 589 (2013).

4  Based on the Supreme Court decisions in *Myriad* and *Chakrabarty*, "to be patentable,

5  the claimed composition must have markedly different characteristics and have the

6  potential for significant utility." *ChromaDex, Inc. v. Elysium Health, Inc.*, 59 F.4th

7  1280, 1284 (Fed. Cir. 2023). "Markedly different characteristics" means

8  characteristics different from the composition's naturally-occurring constituents. *Id.*

9  The act of "isolating" a naturally-occurring constituent is insufficient to create patent

10  eligibility. *Id.* ("[T]he act of isolating the NR compared to how NR naturally exists

11  in milk is not sufficient, on its own, to confer patent eligibility.").

12      Here, claim 62 (and other compositions claims lacking any express nitrate

13  limitation) (the "Unrestricted Claims") are directed to supplement compositions

14  comprising a nitrate compound and one of the enumerated amino acids. Both these

15  amino acids and nitrates are found in nature, including in meat, vegetables, and other

16  foods. Volek Decl. at ¶ 49-61. In fact, the '531 Patent itself admits that both amino

17  acids and nitrates are "naturally occurring." Ex. 5 at Col. 3-5; 21-22.

18      As explained above, Thermolife and its expert admitted during reexamination

19  that ingesting small quantities of nitrate "would do absolutely nothing." Ex. at ¶ 8. In

20  fact, Thermolife's expert asserted that 6.2 mg/kg bodyweight is necessary to produce

21  "any physiological effect." *Id.* Accordingly, on their face, the Unrestricted Claims

22  cover amino acids plus nitrates in quantities that Thermolife has admitted will have

23  zero physiological effect. If the Unrestricted Claims encompass ineffective quantities

24  of nitrates, then these claims merely cover the administration of amino acids. And the

25  claimed compositions would not possess markedly different characteristics from

26  naturally occurring amino acids. Such claims are not patent eligible subject matter.

27      In *Natural Alternatives Int'l, Inc. v. Creative Compounds, LLC*, the Federal

28  Circuit held that claims directed to a combination of glycine and beta-alanine (an

18

Glaser
Weil

amino acid) were patent eligible, but ***only because*** these components had been "incorporated into particular dosage forms" that were effective for increasing athletic performance. *Nat. Alternatives Int'l, Inc. v. Creative Compounds, LLC*, 918 F.3d 1338, 1348 (Fed. Cir. 2019). The court observed that "[u]nder Natural Alternatives' claim constructions, the quantity of beta-alanine must be sufficient to 'effectively increase[ ] athletic performance,' and the specification provides a method for determining such an amount.')." *See also ChromaDex, Inc. v. Elysium Health, Inc.*, 59 F.4th 1280, 1284 (Fed. Cir. 2023) (explaining the *Nat. Alternatives* holding and stating: the "formulations had different characteristics and could be used in a manner that beta-alanine as it appears in nature cannot. Specifically, the natural products had been isolated and then incorporated into a dosage form—between about 0.4 grams to 16 grams—with particular characteristics . . . Those markedly different characteristics distinguished the claimed supplements from natural beta-alanine and preserved the claims' validity.") (internal quotations omitted).

Here, if the claims of the '531 Patent have no similar dosage or nitrate quantity limitation, the claims encompass the administration of amino acids and trace nitrates. Such claims do not possess markedly different characteristics from amino acids and nitrates found in nature and the claims are therefore invalid under Section 101.

It would be appropriate to end the inquiry with the "markedly different characteristics" analysis, but the results would be the same under the *Alice/Mayo* framework. *Id.* Under the *Alice/Mayo* framework, under step one, the claims are directed to a product of nature for the reasons stated above. And at step two, such claims lack an inventive step because the claimed compositions do nothing more than the administration of amino acids alone would accomplish—because Thermolife has admitted the quantity of nitrates covered by the claims would have no effect.

**b.    Claims of the '531 Patent that would cover tiny quantities of nitrates are anticipated by the prior art.**

"A patent claim is anticipated if each and every limitation is found either

19

expressly or inherently in a single prior art reference. 35 U.S.C. § 102." *Billups-Rothenberg, Inc. v. Associated Reg'l & Univ. Pathologists, Inc.*, 642 F.3d 1031, 1038 (Fed. Cir. 2011). As explained above in Section II.F, there are numerous prior art references that disclose dietary supplements containing the amino acids recited in claim 62, along with various compounds that contain nitrates, including thiamine mononitrate, a component Thermolife has already admitted contains nitrates.[7] Asserted claim 62 is anticipated by any one of these prior art references.

Where a prior art reference discloses an ingredient known to contain nitrates, it discloses nitrates "inherently," even if the reference does not expressly refer to "nitrates." *Standard Havens Prod., Inc. v. Gencor Indus., Inc.*, 953 F.2d 1360, 1369 (Fed. Cir. 1991) ("An anticipatory reference, however, need not duplicate word for word what is in the claims. Anticipation can occur when a claimed limitation is 'inherent' or otherwise implicit in the relevant reference."). It does not matter if anyone appreciated that vegetables or some other ingredient contained nitrates—only that such ingredients did, in fact, contain nitrates. In other words, there is no requirement that a person of ordinary skill would have appreciated or understood that a prior art inherently disclosed a particular property or element. *Abbott Lab'ys v. Baxter Pharm. Prod., Inc.*, 471 F.3d 1363, 1367 (Fed. Cir. 2006) ("Our cases have consistently held that a reference may anticipate even when the relevant properties of the thing disclosed were not appreciated at the time.").

Finally, even if the prior art did not anticipate claims directed to amino acids and tiny amounts of nitrates (and it does anticipate), such claims are obvious. Indeed, it was known to combine amino acids with various vegetables, vitamins, extracts,

---

[7] The '531 Patent is a continuation-in-part application that claims priority to a number of prior filed applications dating back to a provisional application filed on September 18, 2007. Superhuman does not concede that the claims of the '531 Patent are entitled to such a priority date and reserves all right to challenge the priority date for each claim. However, given the breadth of prior art that predates even the earliest possible priority date of the '531 Patent, Superhuman does not fully address priority at this initial stage.

20

products of botanical origin, and thiamine mononitrate. Such vegetables, vitamins, extracts, and other components each had known uses and abilities to produce physiological effects. It would have been obvious, for example, for a person of ordinary skill to add or substitute a particular vegetable or vitamin used in a supplement with another vegetable or vitamin, when trying to achieve a particular effect. Likewise, where a particular prior art reference lists a number of amino acids as an ingredient or potential ingredients, it would have been obvious to a person of ordinary skill to add or substitute any other known amino acid, even if not expressly listed, depending on the goal of the supplement. Volek at ¶ 70-72.

## 4. <u>Plaintiff Will Suffer Irreparable Harm to its Business if this Motion Is Not Granted.</u>

Plaintiff has and will continue to suffer irreparable harm to its business if the Court does not issue a preliminary injunction. The extremely strong showing of likelihood of success on the merits means Superhuman's burden on other elements is lessened. *Laub*, 2024 WL 3221797, at *5. But regardless of any sliding scale, Superhuman is suffering irreparable harm, as discussed below.

Since September 10, 2024, Plaintiff has been unable to sell its Accused Products on Amazon. Declaration of Tristan Stent (the "Stent Decl.") at ¶¶5, 13. As a result, Plaintiff has seen a precipitous drop in its revenues—as Amazon sales previously accounted for approximately 40% of all of its sales of the Accused Products. *Id.* at ¶6. For every day that Plaintiff cannot sell its Accused Products through Amazon, Plaintiff loses out on a significant amount of sales on which its business depends. *Id.* at ¶¶6, 13-15.

Plaintiff is also rapidly losing customers and suffering diminished Amazon rankings. *Id.* at ¶¶16-19. It is well-established that "the loss of customers and goodwill is an irreparable injury" and the "loss of one's market position is also evidence of irreparable harm." *Bee Warehouse, LLC v. Blazer*, 671 F. Supp. 3d 1347, 1362 (N.D. Ala. 2023) (finding that "lost revenue as well as its market position on

Amazon" following product delisting is irreparable harm).  *See also Thursday LLC v. Klhip Inc.,* 2017 WL 6947456, at *2 (M.D. Fla. Dec. 11, 2017) (finding irreparable harm where de-listing on Amazon "causes damage to Plaintiff's rankings which is not capable of remedy through monetary damages").

Before the Takedown Notices, Plaintiff had created and maintained a high ranking for the Accused Products on Amazon.  These rankings have been (and will be) severely negatively affected due to the Takedown Notices. *Id.*  Online market share and rankings on Amazon.com can take months to gain and are based upon algorithms that take into account consecutive sales and sales velocity.  *Id.* at ¶ 18. Products are thus ranked higher, or near the top of a consumer's search, for products with ongoing and positive sales.  *Id.*

As a result of the Takedown Notices and the deactivated listings for the Accused Products, there is now a significant and growing time period of no sales for the Accused Products on Amazon.  *Id.* at ¶ 19.  This has a negative effect on the rankings of the Accused Products.  *Id.*  If and when Plaintiff is able to reactivate its listings, it will once again have to spend significant time and money in an attempt to recapture its high ranking in order to once again be competitive in the pre-workout supplement market, and it may never be able to fully restore its ranking and goodwill. *Id.*  If Thermolife's deactivations are allowed to persist, this reputational and business harm will only increase and likely can never be fully recouped.  *Id.*

In addition, Superhuman has also allocated significant resources to the creation and growth of a subscription-based sales program through their Amazon channel for the Accused Products.  *Id.* at ¶20. This subscription model allows customers to automatically purchase and receive the Accused Products on a regular interval (primarily monthly cycles).  *Id.*  As a result of the Takedown Notices, these subscriptions will be terminated because Superhuman is prevented from supplying the subscribed-to products.  *Id.* at ¶21.  Subscription-based customers are incentivized by Amazon to try alternative products when subscribed products are unavailable.  *Id.*

22

As a result, Thermolife's Takedown Notices have caused Superhuman to lose extremely valuable subscriber customers for the Accused Products. *Id.* at ¶22-23.

Finally, if Thermolife's Takedown Notices persist, Amazon may deactivate Plaintiff's seller account. This would effectively kill Plaintiff's Amazon business. *See Medcursor Inc.*, 543 F. Supp. 3d at 878 (deactivation of plaintiff's Amazon seller account "will effectively put Plaintiff out of business. This is irreparable harm."). As other courts have noted, Amazon is a "seemingly make-or-break sales platform in the current e-commerce environment." *Id.* For Superhuman, not being able to tell on Amazon would have a devastating, if not business-ending, effect. *Id.* at ¶¶6, 13-23.

### 5. The Balance of Harms Favors Plaintiff, as the Harm to Plaintiff Outweighs Any Harm to Defendant.

In the absence of injunctive relief, Plaintiff will suffer irreparable harm to its business as described above. In contrast, Thermolife will not suffer any harm at all. Superhuman merely seeks to restore the status quo and have its products relisted on Amazon, and to enjoin Thermolife from further unjustified interference with Plaintiff's business. Of course, Thermolife could at any time follow the appropriate process for seeking an injunction against a potential infringer, which is to file a lawsuit with the appropriate court and seek relief. It will cost Thermolife nothing to withdraw its extrajudicial and bad faith infringement notification, and to cease from additional interference with Superhuman's Amazon account in advance of any attempt to obtain legitimate judicial relief.

Thermolife cannot plausibly allege that it would suffer harm if the Court permits Superhuman's products to continue to be sold. As Thermolife is well aware, the Accused Products continue to be sold on Superhuman's website. Even if Superhuman's Accused Products are somehow ultimately found to infringe the '531 Patents, any alleged infringement would be compensable by money damages. *See Medcursor,* 543 F. Supp. 3d at 880 (balance weighed in plaintiff's favor and, "to the extent Plaintiff is wrong and Defendants prevail, damages for infringing sales can be

23

1  calculated easily").  Such speculative "harm" pales in comparison to the irreparable

2  and imminent harm that Superhuman faces.

3  **6.    Plaintiff's Requested Relief Serves the Public Interest**

4  The public interest favors granting preliminary injunctive relief in this case.

5  Given "the ubiquity of Amazon shopping to the general public, the public has an

6  interest in a full and fair online marketplace." *Medcursor,* 543 F. Supp. 3d at 880.

7  There is a strong public interest in preserving this robust online marketplace, and in

8  discouraging abusive practices which undermine it, or seek to weaponize its processes

9  as an end-run around established judicial practices for seeking relief for infringement.

10  The public interest is *not* served by allowing Defendant to exploit Amazon's

11  infringement policy and devastate Plaintiff's business.  By merely *alleging*

12  infringement of the '531 Patent—even though that allegation was made in bad faith—

13  Defendant has successfully cut off Superhuman's most critical revenue streams.  With

14  this pressure in place, Defendant has sought to force Plaintiff into an unjust royalty

15  arrangement, refusing to even explain to Plaintiff the basis for its claim of

16  infringement.  Exploitative practices like these do not serve the public interest.  As the

17  *Medcursor* court explained, "the public interest favors preventing a competitor from

18  using a seemingly innocuous intellectual property rights-protection notice to

19  effectively shut down a competitor's business." *Id.*

20  This Court should grant Plaintiff's Motion and allow Plaintiff to establish non-

21  infringement in the proper forum of federal court. *Beyond Blond Productions, LLC v.*

22  *Heldman*, 2021 WL 9315215, at *2 (C.D.Cal., 2021) ("[T]he Court granted Beyond

23  Blond's motion for a preliminary injunction. The preliminary injunction instructed

24  Defendants to withdraw their [Amazon] takedown notices.").

25  **IV.    APPROPRIATE BOND**

26  "The district court retains discretion as to the amount of security required, if

27  any." *Beyond Blond Prods., LLC v. Heldman*, 479 F. Supp. 3d 874, 889 (C.D. Cal.

28  2020) (internal quotation omitted).  The "bond amount may be zero if there is no

24

Glaser
Weil

1    evidence the party will suffer damages from the injunction." *Id.* As explained above,

2    Thermolife will not be harmed by the requested relief.  As a result, there is no need to

3    require a bond.

4    **V.    <u>CONCLUSION</u>**

5          For the reasons enumerated above, Plaintiff respectfully requests that the Court

6    grant this Motion and enter a temporary restraining order (1) enjoining Thermolife

7    from sending or otherwise communicating any takedown or infringement notices to

8    any online platform or marketplace provider, customers, or service providers with

9    respect to Superhuman's supplement products (including but not limited to Amazon),

10   and (2) requiring Thermolife to immediately withdraw and retract all Takedown

11   Notices Thermolife submitted to Amazon with respect to Superhuman's products, and

12   (3) requiring Thermolife to cease and desist from taking any other action that

13   interferes with Superhuman's sale of the Accused Products.  Plaintiff requests a

14   hearing on preliminary injunction before the expiration of the temporary restraining

15   order.

16

17   DATED:  November 11, 2024          GLASER WEIL FINK HOWARD
                                          JORDAN & SHAPIRO LLP
18

19                                      By: /s/ Lawrence M. Hadley
                                            LAWRENCE M. HADLEY
20
                                        Of Counsel:
21                                      A. Colin Wexler
                                        (*Pro Hac Vice* To Be Requested)
22                                      Robert D. Leighton
                                        (*Pro Hac Vice* To Be Requested)
23                                      Paul J. Sauerteig
                                        (*Pro Hac Vice* To Be Requested)
24                                      GOLDBERG KOHN, LTD.
                                        55 E. Monroe, Suite 3300
25                                      Chicago, IL  60622
                                        312-201-4000
26
                                        Attorneys for Plaintiff
27                                      SUPERHUMAN INC.

28

25

1

## <u>CERTIFICATE OF SERVICE</u>

2      I hereby certify that true and correct copies of: Notice and Application for

3  Temporary Restraining Order and Application for Order to Show Cause re

4  Preliminary Injunction; Memorandum of Points and Authorities in support thereof;

5  Declarations of Jeff S. Volek, Tristan Stent, and Robert Leighton in support thereof;

6  and [Proposed] Order have been served on counsel of record for all parties via email

7  on this 11th day of November, 2024 as follows:

8

9              Thermolife International, LLC
               Ron Kramer, Registered Agent
10             1334 E Chandler Blvd #5 - D76
               Phoenix, AZ 85048
11             ron@thermolife.com

12             Devlin Law Firm LLC
13             1526 Gilpin Ave.
               Wilmington, DE  19806
14             Derek Dahlgren
15             ddahlgren@devlinlawfirm.com
               Timothy Devlin
16             tdevlin@devlinlawfirm.com
17             Robert Gajarsa
               rgajarsa@devlinlawfirm.com
18             Andrew DeMarco
19             ademarco@devlinlawfirm.com

20             *Attorneys for Defendant*

21

22

23             */s/ Lawrence M. Hadley*
               Lawrence M. Hadley
24

25

26

27

28